IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID L. STURMS,

　　　　　　　　　Plaintiff,

　　　　v.　　　　　　　　　　　　　　　　Civil Action No. 3:06-cv-77

MICHAEL ASTRUE,
Commissioner of Social Security,

　　　　　　　　　Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.　　Background

　　　　Plaintiff, David. L. Sturms, (Claimant), filed his Complaint on July 25, 2006, seeking

judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

February 12, 2007.[2]  Claimant filed his Motion for Summary Judgment on March 13, 2007.[3]

Commissioner filed his Motion for Summary Judgment on April 12, 2007.[4]

B.　　The Pleadings

　　　　　　1.　　Claimant's Motion for Summary Judgment.

　　　　　　2.　　Commissioner's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 18.

[3] Docket No. 21.

[4] Docket No. 23.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.    Commissioner's Motion for Summary Judgment be GRANTED because the ALJ properly relied on Vocational Expert testimony that Claimant can perform work existing in significant numbers in the national economy.

## II.  Facts

A.    <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits on June 4, 2003, alleging disability since November 6, 2002.  The claim was denied initially and on reconsideration. Claimant requested a hearing before an ALJ and received a hearing on August 3, 2004.  The ALJ issued a decision unfavorable to Claimant on October 1, 2004.  Claimant requested review by the Appeals Council, which remanded the case to the ALJ.  A second hearing was held on April 20, 2005.  Another decision denying benefits was issued on September 1, 2005.  Claimant again sought review from the Appeals Council, but it denied his request.  Claimant brought this action, which proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was 46 years old on the date of the April 20, 2005 hearing before the ALJ. Claimant has a high school education.  Claimant has prior relevant work experience as a maintenance mechanic, a truck driver, and a mechanic helper.

C.    <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: November 6, 2002 – September 1, 2005.

**(Provider Unknown), (Date Uknown), Tr. 147**
Diagnosis: pain on the left side

**(Provider Unknown), (Date Uknown), Tr. 147**
Diagnosis: left sided back pain

**Timothy Bolyard, M.D., 11/12/02, Tr. 149**
Impression: mild hypertrophic change and slight disc space narrowing at L3-4 and L5-S1

**Timothy Bolyard, M.D., 11/17/02, Tr. 150**
Impression: large herniated disc at L3-4, L4-5 and L5-S1 levels centrally and the L5-S1 has a left posterior paracentral component with left L5-S1 exiting foraminal encroachment and L5 nerve root impingement suspected

**Larry V. Carson, M.D., 2/24/03, Tr. 151**
Impression: degenerative disk disease is evident at L3-4, L4-5, and L5-S1, disk herniations at L3-L4 and L4-L5 create mild central canal stenosis and neural foraminal encroachment, there is likely a herniated disk at L5-S1 which does not cause central canal stenosis, but does narrow the neural foramina, bilateral spondylolysis at L5 without evidence for spondylolisthesis

**Larry V. Carson, M.D., 2/24/03, Tr. 153**
Impression: degenerative changes in the lower lumbar spine with attenuation of contrast

**Tygart Valley Physical Therapy, 4/15/03, Tr. 163**
Assessment: patient needs to continue physical therapy for lumbar strengthening and improving function

**B. G. Thimmappa, M.D., 9/15/03, Tr. 174**
Impression: history of back injury, history of degenerative disc disease, history of herniated disc in the lumbar spine, possible diabetic neuropathy, hypertension

**B. G. Thimmappa, M.D., 9/15/03, Tr. 181**
Interpretation: mild obstructive and restrictive pulmonary diseases

**Physical Residual Functional Capacity Assessment, 9/24/03, Tr. 188**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day
      Sit for a total of about 6 hours in an 8 hour work day
      Push and/or pull: unlimited

Postural limitations
      Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
      Wetness, humidity, noise, vibration: unlimited
      Extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, hazards: avoid concentrated exposure

**James Woodford, M.D., 12/15/03, Tr. 199**
Diagnosis: multilevel disc disease at (illegible) spine level

**Lynda Lombardo, M.D. and John Meyer, M.D., 1/29/98, Tr. 236**
Assessment: patient was advised to stop smoking. He suffers from massive obesity. There is also hypertension.

**James Woodford, M.D., 5/5/04, Tr. 248**
Assessment: status post back surgery for multilevel disc disease, post-operative low back pain

**James Woodford, M.D., 4/2/04, Tr. 249**
Assessment: post-operative low back pain

**James Woodford, M.D., 3/17/04, Tr. 250**
Assessment: herniated nucleus pulposus

**James Woodford, M.D., 12/15/03, Tr. 251**
Assessment: multilevel disc disease

**James Woodford, M.D., 8/13/03, Tr. 256**
Assessment: chronic back pain secondary to herniated nucleus pulposus at multi-levels

**James Woodford, M.D., 7/7/03, Tr. 257**
Assessment: low back pain secondary to multilevel herniated discs

**James Woodford, M.D., 6/23/03, Tr. 258**
Assessment: herniated disc of low back x three, decreasing edema of legs

**James Woodford, M.D., 6/9/03, Tr. 259**
Assessment: herniated disc x three of low back, increasing edema of legs, allergic rhinitis

**Bill Hennessey, M.D., 7/1/04, Tr. 262**

Impressions: the patient developed L3-4, L4-5 and L5-S1 disc herniation in November 2002. The clinical history also supports left L5 and S1 radiculopathies occurring at that time as associated with the patient's discogenic conditions. The patient has reached maximum medical improvement regarding his condition of November 2002. The patient still suffers from lower limb radicular pain and to some degree discogenic pain.

**James Woodford, M.D., 7/21/04, Tr. 267**
Assessment: status post HNP of lumbar spine, status post back surgery for HNP, continued back pain, mild swelling of the left calf

**James Woodford, M.D., 6/2/04, Tr. 268**
Assessment: low back pain, status post laminectomy at multiple levels, infected cyst of right pinna, resolving, secondary lymphadenitis, rash of right posterior neck, apparently poison sumac

**Jon S. Laplante, M.D., 9/25/01, Tr. 275**
Impression of thoracic spine: minimal scoliosis

Impression of lumbar spine: degenerative disc space

**James D. Weinstein, M.D., 3/30/04, Tr. 278**
Pre-operative diagnosis: herniated lumbar disc, lumbar stenosis

Post-operative diagnosis: herniated lumbar disc, lumbar stenosis

**C. David Burtner, 2/24/05, Tr. 284**
Impression: suspect central HNP which extrudes inferiorly from the L3-4 disc, central disc bulge/protrusion, L4-5

**C. David Burtner, 8/24/04, Tr. 285**
Impression: bilateral pars interarticularis defects at L5, degenerative changes

**C. David Burtner, 8/24/04, Tr. 287**
Impression: effacement left L5 nerve root sleeves

**Russell Biundo, M.D., 6/21/05, Tr. 289**
Assessment: the patient has features consistent with a herniated disk of the lower lumbar spine in the past with radiculopathy in the left lower extremity. The patient appears to have symptoms at L5-S1. The patient had a micro-diskectomy at L3-4. The patient had multiple herniated discs as confirmed in an MRI of November 2002.

**Medical Source Statement of Ability to Do Work-Related Activities (Physical), 6/21/05, Tr. 294**
Exertional limitations
    Occasionally lift and/or carry 10 pounds

Frequently lift and/or carry less than 10 pounds
Stand and/or walk: less than 2 hours in an 8 hour work day
The patient must periodically alternate sitting and standing to relieve pain and discomfort.
Pushing and pulling are limited in both the upper and lower extremities

Postural limitations
Kneeling, crouching, stooping: occasionally
Climbing, balancing, crawling: never

Manipulative limitations
Reaching in all directions, handling, fingering, feeling: unlimited

Visual limitations
Seeing, hearing, speaking: unlimited

Environmental limitations
Vibration, hazards: limited
Temperature extremes, dust, humidity/wetness, fumes, odors, chemicals, gases: unlimited

D.      Testimonial Evidence

Testimony was taken at the August 3, 2004 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Do you still smoke?

A       Yes, sir.

Q       And how much?

A       About half a pack a day and presently trying to quit.

                        *               *               *

Q       Do you have a driver's license?

A       Yes, sir, I do.

Q       And how many miles are you driving typically in a week?

A      Now maybe 20 to the doctor's and back.  My wife usually does the driving.

*         *         *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q      As far as what you're able to do currently on an every day basis, now you've completed some forms for Social Security which indicates some of your activities and some problems that you have but as things are now how long can you sit without some significant problems?

A      Not very long, already sitting here now my left leg is numb.

Q      We've been here about what ten minutes, 15 minutes?

A      Yes.

Q      Okay.

A      May I stand up, sir?

ALJ    Sure you may.

BY ATTORNEY:

Q      What about standing?  How long can you stand?

A      I can stand pretty well, a good while as long as I keep moving and walking is the best to relieve the pain.

*         *         *

Q      How long can you stand?  Longer than you can sit or - -

A      Oh, yeah, I can stand longer.  It eases the pain more as long as I walk a little bit.

Q      And about how long all together would you be able to stand and walk - -

A      Oh, a half hour.

Q	Okay.  Now you mentioned that you sit in a recliner.

A	Yeah.

Q	During the day is that something that is - - that you do by habit or is that something you consider necessary?

A	That's something I have to do to relieve the pressure on my back.

Q	And in - - let's say if we - - if you got up at 8:00 or let's go to 6:00, ten hours, in that ten hour period, how often are you in that recliner?

A	Seven or eight hours anyway probably.

Q	Total during the day?

A	Yeah, total.

Q	Okay.  Is that up and down or - -

A	Up and down, yes.

*			*			*


Q	Are you able to take care of your own personal needs as far as feeding yourself and maybe cooking a little bit and dressing yourself and that sort of thing?

A	At times but my wife has helped me a lot.

Q	Are you able to get in - - do you take baths or showers?

A	Showers.

Q	Are you able to get in and out of the shower by yourself okay?

A	Yeah, pretty much.

Q	Are you able to dress as far as putting on your pants and your shoes and socks?

A        No, sir, my wife has to put my shoes and socks on. I hate to say it but my underwear because I can't bend over far enough. She has to wash my feet and lower parts of my legs and - -

Q        Okay.

A        Because I can't bend over very well.

Q        Are you still able to go out and do social activities like going to dinner, going to movies, going to church, things like that?

A        Occasionally, occasionally, yeah, I like to go to church every now and then and - -

Q        Can you sit through a whole church service?

A        No, I used to go and do the Sunday morning and the whole, you know, Sunday school and the services but I just go just to the service and several times during the service I have to get up and walk to the bathroom or outside to get relief.

*                *                *

[EXAMINATION OF CLAIMANT BY ALJ]

Q        What did you do yesterday?

A        Helped my wife make some blackberry jam. That was the extent of it.

Q        How did you help her? What did you have to do?

A        Helped her mix some berries.

Q        Were you standing doing that?

A        Yes.

Q        What would it be like for you, Mr. Sturms if I gave you a job not like at WBU but where you could stand but not lift much? How would that be eight hours a day starting

tomorrow?

A       I couldn't do it.  My feet and legs swell that's why I have to wear sandals because they adjust, already they're swelled.

*          *          *

Q       Have you made any trips?

A       I've made a couple trips to Roanoke, Virginia.

Q       And why did you go there?

A       I have in-laws there.

Q       What is that five hours?

A       Yes, sir, approximately.

Q       Did you drive as well?

A       I drove part of the way.

Q       Did other - -

A       About an hour of it.

Q       Did it hurt your legs?

A       Yes.

Q       And how long did you stay each time would you say?

A       I think we stayed like for the weekend.

Q       So you would go on a Friday and come back on a Sunday?

A       Yeah, Sunday afternoon leave down there.

*          *          *

Q       Do you lie down during the day?

A        No, I have trouble laying down, it increases the pain.  I haven't hardly slept in my bed since November of '02.

Q        How much sleep are you getting a day?

A        Three, four hours, I suppose.

Q        A night I mean.

A        And that's in the recliner.

                                    *                *                *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Sturms, do you still hunt?

A        If you want to call it hunting, sir.

Q        Tell me your system.

A        Pardon me?

Q        Tell me what you do.

A        I drive up on my usual spot and I walk about 20 yards from the truck and my son and I stand there till I can't stand it no longer or sit there, I'm sorry, till I can't stand it no longer and then I stand up and fidget or walk back and forth or however you want to describe it but that's pretty  much - -

Q        So you don't go - - are you staying in one spot or are you - -

A        No, I will walk.  It's on top of a ridge.

Q        Um-hum.

A        And I pace back and forth of this ridge.

Q        How did you use to hunt?

A       I was all over the place.

Q       Okay.

A       I still hunted a lot and - -

Q       Have you gone fishing this summer?

A       No, I haven't.

Q       When's the last time you did hunting in that style, last fall?

A       Yes.

Q       Any since January since your surgery in March '04?

A       No, I haven't.

*   *   *

Testimony was also taken at the April 20, 2005 hearing.  The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

A       I quit smoking, too, sir.

Q       Okay.  When did you quit smoking?

A       The first of April.  I mean, I'm sorry, first of March.

Q       Of '05?

A       Yes, sir.

*   *   *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       When you drove here today how far was that?

A       It's about 32 miles.

Q       And what effect did that drive have on you if any?

A       I had to stop halfway, get out and stand for a few minutes.  It's normally a 50 minute drive which it took me about an hour and 40 minutes to get here.

*                    *                    *

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Okay.  What do you do with your son?  I mean do you have full care of him?

A       Yes.

*                    *                    *

Q       So he's [sic] taking him to all these appointments?

A       My sister.

Q       Okay.  Because you can't do it?

A       Sometimes I can, sometimes I can't.

Q       Have you seen him perform in the chorus or band?

A       Yes.

Q       How many times?

A       Not as much as I'd like to.  To put a number on it I'm going to say half of the times I've probably been able to see like his chorus or - -

Q       How about piano recital?  Do you go to any of those?

A       Yes, that's twice a year.

Q       Is that usually in Grafton or is it somewhere else?

A       Yeah, it's in - - no it's in Grafton.

Q       Okay.  Do you go to any basketball or football games at Grafton High School?

A       No.

Q       Did you used to play for Grafton?

A       Yes.

Q       What sport?

A       Football, baseball, basketball.

Q       Do you think they have anything to do with your back?  Now the condition of your back now or is it separate this thing?

A       No, I don't think so.

Q       What - - do you feel better since you quit smoking?

A       Yes.

Q       What are you doing to do about the - - has Dr. Weinstein or Dr. Woodford talked to you about your weight?

A       Yes.

Q       Because of the impact on your back.  And what do they recommend?  What have they told you?

A       Well they said I need to lose weight but it's hard to - -

Q       Do you try to exercise?

A       Yeah, I walk.

Q       Do you walk?

A       Yes.

Q       How long do you walk?  How far I mean?

A       I walk for a half hour.

Q       Each day?

A       Now as far as miles, I couldn't tell you.

Q       Okay.

A       I walk for - -

Q       So like in this nice weather we've been having like yesterday did you walk one half mile?

A       I probably walked a half mile, yes.  I walked a half hour.

                        *                  *                  *

Q       Do you cook for both of you?

A       Yes, yeah, some.

Q       How about who's doing your yard work?

A       My son and my neighbor.

Q       Have you been on any camping trips or anything like that?

A       No.

Q       Vacations?

A       No.

                        *                  *                  *

Q       What's going on with hunting and fishing?

A       I haven't.

Q       Did you use to?

A       Yes.

Q      You all didn't fish one time this spring yet?

A      No.

Q      Last summer that whole year did you fish - -

A      No.

Q      - - since we last met last fall?

A      No.

Q      Did you hunt?

A      I would like to but - -

Q      Did you hunt at all last fall?

A      No, sir.

Q      Do you have a license?

A      I've got a license, yes.

*          *          *

Q      When we talked last August, you had gone to Roanoke, Virginia, on a couple of trips. You haven't done that again?

A      No.  The only reason I done that before was try to save my marriage or I wouldn't have done it.

Q      You were attending church occasionally.  Are you doing that?

A      I still do, yes, sir.

Q      And how many times in the month of April so far?

A      I've gone every Sunday.

Q      How long is the service?

A       The service is an hour and then Sunday school is an hour before that so two hours total.

*              *              *

Q       Do you lie down during the day?

A       It's hard, it's still hard to lay down.  No, I usually recline in the recliner.

Q       How long yesterday?

A       The total day four hours total probably.

Q       Is it like so many minutes at a time or is it like an hour at a time or - -

A       Well it just depends, sometimes it is up to an hour at a time or even a couple hours at a time if I have to, whatever it takes to relieve.

Q       What did you do yesterday?   What time did you get up?  Take me through your day.

A       I get up at about 7:00, get - - tell my son to get ready for school and - -

Q       Does he go on the bus?

A       Yes.

Q       Okay, go ahead.

A       And let's see what was yesterday, Tuesday.  Okay and then I do a load of laundry yesterday.  Clean up the house a little bit.  Little bits at a time on everything you know.

Q       Um-hum.

A       And then I have to go and rest.  I try to walk my half hour in the mornings usually after I get a few things done in the mornings.  Then I'll walk out the street and back and forth out the street in front of my house for a half hour.

Q       Did you cook yesterday?

A       Yesterday I don't think I did.

                    *           *           *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       How would you describe Mr. Sturms past relevant work?  Mainly the WBU job and I think the maintenance.

A       Maintenance mechanic helper is heavy and skilled and the production maintenance mechanic is heavy and skilled also, Your Honor.

ALJ           Please assume a younger individual with a high school education precluded from performing all but - - you don't have any mental issues, do you, Mr. Sturms?

CLMT          No, sir.

ALJ           You're not taking any medication or going to any counselling?

CLMT          No, sir.

ALJ           Sedentary work.

CLMT          Excuse me, sir.

ALJ           Go ahead, sir.

CLMT          I am going to counseling through this with my son through this divorce stuff and - -

ALJ           Oh, okay.  Like family counseling?

CLMT          Yeah.

ALJ           Okay.

CLMT          It's through the Ala-Teen and Ala-Non and - -

| | |
|---|---|
| ALJ | Okay. |
| CLMT | So - - |
| ALJ | Is she considered an alcoholic or a drug addict? |
| CLMT | Both, yes. |
| ALJ | Oh, okay. |

BY ADMINISTRATIVE LAW JUDGE:

Q       Sedentary work with a sit/stand option, occasional posturals, no hazards such as machinery or unprotected heights, no climbing, and no foot pedals, clean air environment.  With those limitations, sir, can you describe any work this hypothetical individual can perform?

A       Yes, Your Honor, at the sedentary level that hypothetical individual I believe could function as an assembler sedentary, 149,000 nationally, 1,450 regionally, and region is West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland.  Or an office clerk 299,000 nationally, 2,900 regionally.

Q       Are those jobs consistent with the Dictionary of Occupational Titles?

A       I believe they are, Your Honor.

Q       Mr. Bell, the Claimant testified he doesn't exactly lie down in a prone position but he lies down in a recliner.  If he even had to lie down in that fashion one hour in the a.m. of work day, normal work day and one hour in the p.m. of a normal work day are those jobs affected?

A       Yes, they would not allow for competitive work, Your Honor.

Q       What if the Claimant's pain and fortunately his Percocet has been reduced but if his pain was so severe that he could not stay on task one-third to two-thirds of the day are those

jobs affected?

> A      Yes, they'd be eliminated, Your Honor.

*               *               *

E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Requires help in washing, bathing, and dressing himself (Tr. 127)

- Prepares meals including cereal, sandwiches, and frozen foods (Tr. 128)

- Does laundry and vacuuming (Tr. 128)

- Pays bills and manages bank accounts (Tr. 128)

- Does a little gardening (Tr. 128)

- Shops for food and medications (Tr. 129)

- Reads newspapers for one hour per day (Tr. 129)

- Watches television for ten to twelve hours per day, listens to the radio for two to three hours per day, and listens to records and tapes for one to two hours per day (Tr. 129)

- Has hobbies of hunting and fishing (Tr. 129)

- Obesity (Tr. 236, 310)

- Smoked for some of the relevant time period (Tr. 310, 334)

- Has a driver's license and is able to drive on a regular basis (Tr. 310)

- Went to Roanoke, Virginia to visit in-laws (Tr. 323)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant makes only one assignment of error. He notes the ALJ found Claimant required a sit/stand option. Yet the Dictionary of Occupational Titles does not contain information regarding sit/stand options. A Vocational Expert testified work with a sit/stand option exists that Claimant can perform. The Vocational Expert did not testify about how he identified this work when the Dictionary of Occupational Titles does not speak about sit/stand options. Claimant argues that while the ALJ could find work exists for Claimant with a sit/stand option based on Vocational Expert testimony, the Vocational Expert must explain how he identified the work given the absence of Dictionary information.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner contends the evidence shows Claimant is not disabled.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the

Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment.  If Claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

Whether the ALJ Erred in Relying on the Vocational Expert's Testimony Regarding Claimant's
Ability to Perform Certain Jobs

Claimant's one argument is that the ALJ erred in relying on the Vocational Expert's

testimony that Claimant can perform certain jobs in the national economy.  Claimant states that

when the ALJ asked the Vocational Expert if a hypothetical person with Claimant's limitations

could perform any work, the Vocational Expert identified positions that in fact were not

consistent with the hypothetical as the Dictionary of Occupations Titles (DOT) defines the ALJ's

limitations.  Claimant then argues that although the ALJ could rely on this testimony if the

Vocational Expert provided an explanation for the conflict with the DOT, no such explanation

was given.  Claimant asks that this case be remanded to the ALJ for clarification regarding

whether Claimant can perform any work.  Commissioner contends the ALJ's opinion is

supported by substantial evidence.

When a claimant shows an inability to resume prior work, the burden falls to

Commissioner to demonstrate "that the claimant, considering his age, education, work

experience, skills and physical shortcomings, has the capacity to perform an alternate job and

that this type of job exists in the national economy."  Coffman v. Bowen, 829 F.2d 514, 518 (4th

Cir. 1987).  The Regulations provide the ALJ may consider VE testimony and the DOT in

determining whether work exists suited to a claimant's residual functional capacity.  20 C.F.R. §

404.1566.  The Dictionary of Occupational Titles does not contain information regarding a

sit/stand option.  Fisher v. Barnhart, 181 Fed. Appx. 359, 366 (4th Cir. 2006).  Social Security

Ruling (SSR) 00-4p states VE testimony and the DOT should normally be consistent.  When "an

apparent unresolved conflict" exists between these sources, the ALJ must "elicit a reasonable

explanation for the conflict." Id.  Neither source automatically prevails.  Id.  The ALJ should resolve a conflict by deciding whether the VE testimony is reasonable and provides grounds for relying on the testimony over the DOT.  Id.

In Justin v. Massanari, 20 Fed. Appx. 158, 160 (4th Cir. 2001), the court considered Acquiescence Ruling (AR) 00-3(10), which is substantively the same as SSR 00-4p.  The court found the Ruling only required the ALJ ask about obvious differences between Vocational Expert testimony and the DOT and "specifically declines to place an obligation on ALJs to uncover such discrepancies." Id.  The court also cited to SSR 00-4p in support of its finding.  Id. In light of this law, it is clear that in this circuit the ALJ does not have an absolute duty to question a Vocational Expert on whether his testimony is consistent with the DOT.  Rather, such a duty only exists where there is an obvious difference.

The court confronted a situation similar to this case in Smallwood v. Comm'r of Soc. Sec., 2003 U.S. Dist. LEXIS 15668 (E.D. Pa. Aug. 18, 2003).  In that case, the ALJ asked the Vocational Expert about positions allowing a person to sit or stand at will.  Id. at *31.  The ALJ did not require the Vocational Expert to speak about how these positions reconciled with the fact that the DOT does not address sit/stand options.  Id.  The court held that the fact that the DOT does not include a sit/stand option does not automatically give a conflict between Vocational Expert testimony and the DOT.  Id. at *31-33.  The court noted the DOT does not describe all positions.  Id. at *32 (quoting Wright v. Sullivan, 900 F.2d 675, 684 (3d Cir. 1990)).  It also noted that SSR 00-4p stated the ALJ could rely on the Vocational Expert's personal experience. Id. at *33.  The court concluded that "no conflict existed between the vocational expert's testimony, which assumed that some cashier, bench assembly, and packing jobs might

accommodate a sit/stand option, and the DOT's occupational definition of those jobs, which was silent as to whether such an option existed." Id.

The ALJ found Claimant could not perform his past relevant work. (Tr. 28). The ALJ asked the Vocational Expert if a person limited to sedentary work and with need of a sit/stand option, as well as other limitations, could perform work in the national economy. (Tr. 353-54). The Vocational Expert identified the positions of assembler and office clerk. (Tr. 354). He testified there were 149,000 assembler positions nationally and 1,450 in the region and 299,000 office clerk positions nationally and 2,900 in the region. (Id.). He did not testify about how these jobs allow for a sit/stand requirement. (Id.).

Under the above cited law, the ALJ was entitled to rely on the Vocational Expert's testimony that these jobs conformed with the hypothetical propounded and no conflict arose between the testimony and the DOT simply because the DOT does speak about a sit/stand option. Smallwood, 2003 U.S. Dist. LEXIS at *31-33. Since no conflict existed, the ALJ did not have a duty to make further inquiries. Justin, 20 Fed. Appx. at 160. Once the ALJ asked about positions including a sit/stand option, he could use the jobs identified to support a finding work existed for Claimant. Hence, Claimant's argument is without merit and the ALJ should be affirmed.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be DENIED.

2.     Commissioner's Motion for Summary Judgment be GRANTED because the ALJ properly relied on Vocational Expert testimony that Claimant can perform work existing in

significant numbers in the national economy.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 20, 2007

 /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE